[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On September 14, 1992, the plaintiff, V. Louison Et Cie, filed an amended complaint against the defendant, West Haven Buckle Company, seeking money damages for an alleged breach of contract. On November 6, 1992, the defendant filed a counterclaim against the plaintiff. The defendant subsequently filed an amended counterclaim dated March 17, 1994, consisting of seven counts.
The plaintiff and the defendant allege the following facts. The plaintiff is a French company in the business of selling textile products. The defendant is a Connecticut corporation in the business of manufacturing various belts, straps and closure devices. In the mid to late 1980s, the plaintiff and defendant commenced a business relationship by which the plaintiff was to supply the defendant with materials for its manufacturing business. In particular, the plaintiff supplied the defendant with (1) elastic loop material and (2) mushroom hook tape. This relationship existed and continued until 1989.
In late 1987 to early 1988, the defendant became delinquent in its payments to the plaintiff. (Defendant's Ex. 41; Plaintiff's Ex. b, e.) The plaintiff called for payment within 60 days of receipt and the defendant had failed to make payments up to 150 days after receipt of the goods from the plaintiff. (Defendant's Ex. 19, 41.) In July, 1988, the defendant proposed a payment schedule of 150 days. (Plaintiff's Ex. b.) The plaintiff called for payment within 60 days of receipt and the defendant had failed to make payments up to 150 days after receipt of the goods from the plaintiff. (Plaintiff's Ex. b.) This proposal was met by a counter-proposal by the plaintiff for a payment schedule of 60 CT Page 9424 days, with a 2% monthly finance charge. (Plaintiff's Ex. b.) The defendant did not expressly agree to the 60 day payment schedule. (Plaintiff's Ex. e.)
The defendant claims that during the period of April to June of 1989, problems with quality control had surfaced regarding the plaintiff's product. (Defendant's Ex. 1, 3, 6, 8, 9, 10, 11, 16, 31.) On July 4, 1989, the plaintiff informed the defendant that, due to the quality control problems and late payments, the plaintiff must decide whether to continue delivering goods to the defendant. (Defendant's Ex. 12.) On July 11, 1989, the plaintiff requested payment for the invoices of November, 1988, December 1988 and January, 1989, and stated that its financial consultant is considering stopping shipments to the defendant until the money is paid. (Defendant's Ex. 13.) On July 17, 1989, the defendant proposed a payment schedule by which the defendant would pay for each shipment when delivered plus an additional 20% surcharge to be applied against its past balance. (Defendant's Ex. 20.) On July 19, 1989, the plaintiff replied that the proposed payment schedule is unacceptable for the invoices from November, 1988, December, 1988 and January, 1989, but would be acceptable for the more recent overdue invoices. (Defendant's Ex. 21.) On August 1, 1989 the defendant sent a check in accordance with the previous letter, which was accepted.
On September 12, 1989, the plaintiff notified the defendant that it was stopping all deliveries to the defendant. (Defendant's Ex. 28.) The plaintiff stated that its credit insurer would not extend any more credit to the defendant, forcing the defendant to pay for any goods prior to delivery. (Defendant's Ex. 28, 30.) This lawsuit followed.
 I.
The list of invoices (Ex. a) totals $75,380. At diverse times in the spring of 1989, the defendant complained to the plaintiff about defective merchandise being shipped. The plaintiff was able to ship several lots of ribbon to other dealers, and issued credit memos for others. A credit memo was filed, as being prepared by the defendant, totalling $12,652.19 (Ex. 14). This left a total balance of $62,727.19.
The complaint also asked for interest. There is no record of West Haven Buckle ever having paid interest on any delinquent amounts. The conduct of the parties in interpreting any particular CT Page 9425 agreement is important. "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance except that are acquiesced in without objection shall be relevant to determine the meaning of the agreement." Connecticut General Statutes § 42a-2-208
(1). In the present circumstances, failure of the plaintiff to invoice for and collect interest after the claimed 60 day payment period is relevant in interpretation of the contract and must be given controlling weight, as that is how the parties dealt for a period of 2 years.
"Q. Up until September of 1989 you had never billed West Haven Buckle for interest, had you?
A. I don't remember. I don't know"
(Trans. June 16, 1994, p. 8 cross-examination of Mr. Louison).
 "The allowance of interest as an element of damages is, thus, primarily an equitable determination and a matter lying within the discretion of the trial court."
Bertozzi v. McCarthy, 164 Conn. 463, 467.
The court allows no interest in the judgment.
 II.
The defendant filed a counterclaim, consisting of seven counts.
The first claim is a breach of warranty. The matter is covered by Section 42-2-208, Connecticut General Statutes, and the claim is waived accordingly.
The second claim is for lost profits. There was no evidence offered for this claim.
The third claim is for a breach of agreement. Again, the parties had dealt with each for years and established a course of dealing. CT Page 9426
The letter of September 12, 1989 constituted a breach without "reasonable notification".
 "We hold that the plaintiff had no right to peremptorily cancel the unfilled portion of the order on August 8th, 1916, without first giving reasonable notice of its intention to insist on strict performance."
 Remington Arms UMC Co., Inc. v. Gaynor Mfg. Co., 98 Conn. 721,732.
 " . . . (3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable."
See Sec. 42a-2-309 (3) Connecticut General Statutes.
. . .
 "(1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
 (2) A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that CT Page 9427 such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court."
Section 42a-1-203 Connecticut General Statutes.
 "Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."
Section 42a-1-203 Connecticut General Statutes.
The buyer may have the following recourse:
 "(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract, as provided in section 42a-2-612, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid (a) `cover' and have damages under the next section as to all goods affected whether or not they have been identified to the contract; or (b) recover damages for nondelivery as provided in section 42a-2-713."
Section 42a-2-711 Connecticut General Statutes.
 "(1) Subject to the provisions of section 42a-2-723 with respect to proof of market price, the measure of damages of nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price CT Page 9428 together with any incidental and consequential damages provided in section 42a-2-715, but less expenses saved in consequence of the sellers breach."
Section 42a-2-713 Connecticut General Statutes.
On September 13, 1989, Louison sent a letter to the defendant that the situation had changed and would ship no more (Ex. 30).
The defendant attempted to "cover" (Ex. c) the needs of the defendant's customers, but with no results. Kendall revoked its acceptance, which the defendant lost $11,000. (Ex. 45).
The defendant suffered a loss of $11,000., as a direct result from the action of the plaintiff. This is the claim of the Third Count and the Fourth Count. JoAnn Inc. v. Aldin Fragrances,731 F. Sup. 149.
There is no evidence supporting the Fifth Count.
The Sixth Count is a violation of the covenant of good faith. It is subsumed in the third claim of the counterclaim. See Section42a-1-203 Connecticut General Statutes.
The Seventh Count is a CUTPA claim and claims that the aforesaid acts constitute an unfair trade practice. The court finds that the plaintiff has committed no unfair trade practice.
 "In order to prevail in a cause of action under CUTPA, the facts proved by the evidence must establish either `unfair methods of competition [or] unfair or deceptive acts or practices,' which `have a potential effect on the general consuming public.'" (citations omitted).
 "The legislature has directed that `courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45
(a)(1)).' General Statutes § 42-110b(b). We CT Page 9429 followed this mandate recently, and adopted the criteria set out in the `cigarette rule' by the federal trade commission for determining when a practice is unfair: `(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." (citations omitted).
McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567, 577.
 "It is true that this court has acknowledged the statement of the Federal Trade Commission (FTC) that all three criteria set out in the cigarette rule `do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.' McLaughlin Ford. Inc. v. Ford Motor Co., supra, 569 n. 15, quoting Statement of Basis and Purpose, `Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures,' 43 Fed. Reg. 59, 614, 59, 635 (1978). We note, however, that the phrase `or because to a lesser extent it meets all three' suggests that conjunctive linkage may be appropriate in certain cases. Further, in his article, `The Meaning of "Unfair Acts or Practices" in Section 5 of the Federal Trade Commission Act', 70 Geo. L.J. 225, 285 (1981), Neil Averitt, a member of the planning staff of the commission's bureau of competition, summarized that under the cigarette rule `[t]he propriety of commercial conduct was to be judged by considering whether it (1) caused substantial consumer CT Page 9430 injury; (2) violated established public policy; and (3) was immoral or unscrupulous.' (Emphasis added.) Moreover, in 1980 the commission `reviewed those factors and concluded that "[u]njustified consumer injury is the primary focus of the FTC Act, and the most important of the three . . . criteria.'" D. Rice, `Consumer Unfairness at the FTC: Misadventures in Law and Economics,' 52 Geo. Wash. L. Rev. 1, 4 (1983), quoting letter from FTC commissioners, December 17, 1980. . . . is permissible only if a practice causes [unjustified] injury that is substantial. . . ."
Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 242, 243.
 "In discussing the third criterion, the federal trade commission has stated: `The independent nature of the consumer injury criterion does not mean that every consumer injury is legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.' Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, `The Meaning of "Unfair Acts or Practices" in § 5 of the Federal Trade Commission Act § 5 of the Federal Trade [1981])."
McLaughlin Ford. Inc. v. Ford Motor Co., 192 Conn. 570, 571; WebPress Services Corporation v. New London Motors Inc. 205 Conn. 479,489.
The defendant could have avoided the substantial injury. The defendant could have paid the overdue invoices as requested by the plaintiff. It comes as no surprise. See Ex. 21, 22, 23, 24 and 28. There was no unfair trade practice.
III. CT Page 9431
The plaintiff may recover the sum of $62,727.19 less the amount the defendant recovered under the counterclaim of $11,000.00.
Judgment may enter for the plaintiff in the amount of $51,727.19 with costs.
Robert P. Burns, Judge